# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

DANIEL RIDGE,

    Defendant-Appellant.

FOR PUBLICATION
April 25, 2017
9:00 a.m.

No.  333790
Eaton Circuit Court
LC No.  16-020086-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

DEBRA OLNEY,

    Defendant-Appellant.

No.  333791
Eaton Circuit Court
LC No.  16-020087-FH

---

Before:  BORRELLO, P.J., and WILDER and SWARTZLE, JJ.

BORRELLO, P.J.

In these consolidated cases, defendants Daniel Ridge (Docket No. 333790) and Debra Olney (Docket No. 333791) appeal by leave granted[1] a June 27, 2016, circuit court order denying their motions to quash their bind-overs on charges of owning a dangerous animal causing serious injury in violation of MCL 287.323(2). For the reasons set forth in this opinion, we reverse and remand for entry of an order quashing the bind-overs.

## I. FACTS

---

[1] *People v Ridge*, unpublished order of the Court of Appeals, entered November 9, 2016 (Docket No. 333790); *People v Olney*, unpublished order of the Court of Appeals, entered November 9, 2016 (Docket No. 333791).

-1-

Defendants Daniel Ridge and Debra Olney are married. In September 2015, the couple lived in a residential neighborhood and owned two dogs. The dog at issue in this case was a "possible pit bull, Shar-Pei mix" named Roscoe.

Jill Flietstra, an employee of Scott's Lawn Care, testified that when she arrived at the property next door to the home of defendants on September 10, 2015, she "saw two large dogs in defendants' backyard." Flietstra testified that the property she was working on and defendants' property were separated by a chain-link fence. Flietstra testified that the dogs "seemed like normal dogs" to her and denied that their behavior caused her concern—even when they were jumping on the fence.

Flietstra testified that she began spraying fertilizer and weed control, but took care to avoid spraying around the animals. Flietstra testified that when she was spraying near the fence line in issue, she was "approximately three feet away" from the fence. Her back was to the fence and she was "spraying forward." Janis Strang, one of defendants' next door neighbors testified that she observed Flietstra spraying the day she was injured. Janis testified that Flietstra was approximately five feet from the fence when spraying and that Flietstra was "probably" spraying about five or six feet away from her body.

Flietstra testified that while she was spraying, Roscoe got "partially underneath the fence" and "grabbed [her] by the boot." Flietstra testified that Roscoe "pulled [her] leg partially underneath" the fence during the ensuing struggle. She said she "couldn't get away from its grasp, so [she] let it take [her] boot off." After she lost her boot, Roscoe "completely came underneath the fence, squared off with [her] and started coming after [her]." Flietstra testified that when the dog "charged," she tried to "block it" using her hands, which were gloved; Roscoe then "kept biting" and "was grabbing, clenching, and then shaking its head" while biting her hands. Flietstra testified that Roscoe also "got a hold of her pants" and was "biting everywhere it could."

Flietstra testified that "[e]ventually, the dog kind of tired out a little bit and [she] seized that opportunity to jump on top of it." Flietstra testified that she was holding Roscoe by the collar with one hand, while the "other hand [was] in its mouth so it would stop biting [her] abdomen and [her] legs and everything" when police arrived.

Janis Strang testified that she heard a lot of barking from defendants' yard. Janis noted that defendants' dogs "bark all the time, but they acted like something was really agitating them" that day. Janis described the dogs as "barking at something on the other side of the fence. And I mean really barking; they were hitting the fence, and—and jumping." Janis testified that she heard Flietstra scream "get off me" and then continue screaming. Janis stated that she could not see Flietstra, but saw Roscoe "shaking . . . like [he] was attacking." She called 911. Janis denied ever calling animal control or the police regarding Roscoe prior to the attack on Flietstra.

Eaton County Sheriff's Department Deputy Joe Travis testified that he was notified by dispatch of "a [sic] animal bite in progress." Travis arrived at the home of defendants' neighbor, Janis Strang, who pointed to where a female was being attacked. Travis ran to the next yard where he saw a dog pulling Flietstra. Travis approached and yelled something and the dog

released.  Travis testified that he then shot and killed the dog as it appeared ready to charge at him.

Travis testified that Flietstra "stated that she could not move her arms; that she thought she had several broken bones," and he observed "several punctures and—and bleeding." Flietstra testified that she "had bite marks just everywhere, all over my body, contusions, bruising."  She explained that "the dog bit through a [bone] in my left hand.  I [had] one more fracture in my left hand near my pinkie bone.  I had to get six large puncture wounds stitched up with eleven stitches . . . ."

Detective Christopher Burton investigated the attack on Flietstra.  Burton testified that he spoke with defendants.  Ridge described the dog as a "family dog" and had Roscoe for about "two, three years" prior to the incident.  Ridge informed Burton that "the dog's never been aggressive before.  Never heard him growl at anybody or bite anybody before."  Burton testified that Olney echoed Ridge's statements, stating that "she was very surprised this would happen; again because [the dog] wasn't violent towards anyone in the past.  And they have a lot of people that are in and out of the house.  And the dogs have never shown any violence towards them in the house."  However, Ridge acknowledged that Roscoe previously attacked the neighbor's lawnmower and on one occasion Roscoe punctured the tire of Dennis Strang's lawnmower.

Dennis testified that Roscoe bit his tractor tires twice.  The first time the dog bit the lawnmower tires Roscoe got his face under the fence and bit the tire, causing enough damage to necessitate repairs.  According to Dennis, the other time he "pulled [Roscoe] the rest of the way through the fence" by reversing his tractor.  Dennis testified that as he was taking Roscoe back to defendants' property, he "wouldn't look at the dog.  Because an animal can sense fear, and [he] was afraid if [he] looked at the dog he might attack [him]."  Dennis testified that he spoke with Ridge after the second incident and that Ridge told him "they were trying to find another home for the dog."  Dennis denied informing Ridge that he was afraid of Roscoe.

Dennis testified that after the second attack on the lawnmower he began carrying his handgun with him while he mowed his lawn.  Dennis also testified that he observed Ridge "put[ting] some more fencing up" and testified that Dennis "cut a piece of four-by-four and put it down by the fence so the dog couldn't get though again."  Burton testified that defendants "tried securing the bottom of the fence and put some meshing on the bottom of the fence along both fence lines" and "[t]hey put some slats that they got from another neighbor or from someone to try and block the view of the dog."

Dr. Jennifer Link, an Associate Veterinarian at the Miller Animal Clinic, testified that Roscoe, was a "neutered male" dog born May 24, 2014, and was treated at the Miller clinic. Link testified that Olney requested "a letter of the temperament of the dog."  That letter indicated: "[a]ccording to [the clinic's] records [the dog] never displayed any signs of aggression or required the use of a muzzle or sedation to be handled."

Janis Strang testified that she did not have any previous "contact" with Roscoe because she did not "go in the backyard."  Janis testified that she kept to her deck "cause you can get back in the house really fast because the slider's right there."  "[I]f I ever went down to, like, water my plants," she continued, "he [Roscoe] was always there barking and being really

-3-

aggressive." Janis also testified that "[n]one of [her] grandkids would go in the backyard," and noted that Roscoe "was scary," and would bark at "anything that moved." Dennis testified that their grandchildren "didn't play in the backyard 'cause [sic] the dogs just raised so much hell that there's no reason." Dennis also testified he saw Roscoe playing with defendants' children and had not witnessed the dog be aggressive with defendants' children. Dennis stated that defendants' dogs would run at the fence when he was in his backyard and would bark, jump and bite the fence.

Victoria Steffy, an acquaintance of Olney, testified that Olney described Roscoe as a pit bull and said "they were having some issues with his behavior and with their neighbors." Steffy testified that Olney told her she was having a problem with Roscoe "biting tires of lawn mowers" and with "her neighbors being afraid of him." Steffy told Olney that biting tires is "unacceptable behavior for any dog."

Following the conclusion of the police investigation into the dog attack, plaintiff charged defendants under MCL 287.323(2), which provides as follows:

> If an animal that meets the definition of a dangerous animal in [MCL 287.321(a)] attacks a person and causes serious injury other than death, the owner of the animal is guilty of a felony, punishable by imprisonment for not more than 4 years, a fine of not less than $2,000.00, or community service work for not less than 500 hours, or any combination of these penalties.

MCL 287.321(a) defines "dangerous animal" in relevant part as follows:

> a dog or other animal that bites or attacks a person, or a dog that bites or attacks and causes serious injury or death to another dog while the other dog is on the property or under the control of its owner.

After the preliminary examination,[2] defense counsel moved to dismiss the complaint. The district court denied the motion, explaining: "It comes down to what was in the mind of Ms. Olney and—and Mr. Ridge. So the question is did they genuinely and reasonably believe that the animal was safe around other people and animals. I think that's the ultimate issue in the case." The district court went on to conclude that "there's some evidence here that they knew that there was a problem," and determined that plaintiff "has met [its] burden of some credible evidence, though I think [it] would have a hard time at trial." The district court went on to find:

---

[2] The district court held a preliminary examination hearing on February 9, 2016. At the close of proofs, the district court found probable cause to bind defendants over for trial. Thereafter, defense counsel filed a memorandum of law arguing that the prosecution failed to establish its burden of proof. The district court then granted the prosecution's motion to re-open proofs and heard additional testimony on March 11, 2016. At the close of that hearing, defense counsel moved to dismiss the complaint and the district court denied the motion and bound defendants over for trial.

-4-

I mean, . . . the dog had not bitten anybody. But . . . certainly they had shown enough dangerous proclivity that . . . Mr. Ridge and Ms. Olney were . . . considering making a change. . . .

The burden in a preliminary examination is quite low. It's just is there some evidence to support each element. I'm not at all convinced that a jury would look at this as being something that these people should be socked with a felony. . . .

But there's some evidence here that they knew that there was a problem because this is a dog that they probably loved and they were willing to take steps to get rid of the dog, to send it to a shelter. So they had to have some kind of knowledge that there was some dangerous element.

Based on these findings, the district court bound the case over for trial. Defendants then moved to quash the bind over in the circuit court. The circuit court denied defendants' motion, reasoning:

I believe here the evidence supports the justification for [the district court's] ruling, that the defendants should be bound over. Based on a review of the record, the defendants were aware that the dog scared people and had an aggressive disposition. The dog had exhibited aggressive behavior, such as barking, running up and down the fence, making noise, biting . . . lawnmowers, tires and damaging the tire prior to the incident in question.

The circuit court entered a written order on June 27, 2016. Defendant filed applications with this Court for leave to appeal. This Court granted defendants' applications for leave to appeal and consolidated the appeals.

## II. STANDARD OF REVIEW

We commence our analysis of this matter by observing that preliminary examinations are a creation of our Legislature, and therefore a statutory right. *People v Yost*, 468 Mich 122, 125; 659 NW2d 604 (2003). "[T]he preliminary examination has a dual function, i.e., to determine whether a felony was committed and whether there is probable cause to believe the defendant committed it." *Id*. at 124-125; see also MCR 6.110(E). Probable cause requires enough evidence to make a person of ordinary caution and prudence conscientiously entertain a reasonable belief of the defendant's guilt. *Id*. at 126. If it appears to the district court that there is probable cause to believe that a felony was committed and that the defendant committed it, the court must bind the defendant over for trial. MCL 766.13; MCR 6.110(E). "A circuit court's ruling regarding a motion to quash an information and the district court's decision to bind over a defendant are reviewed to determine whether the district court abused its discretion in making its decision." *People v Waltonen*, 272 Mich App 678, 683; 728 NW2d 881 (2006). Significant to this case, we have previously stated that if the bind over decision entails a question of statutory interpretation, such as whether the alleged conduct falls within the scope of a penal statute, the issue of statutory interpretation is a question of law that we review de novo. *Id*. at 683-684. See

also, *People v Stone*, 463 Mich 558, 561; 621 NW2d 702 (2001); *People v Hotrum*, 244 Mich App 189, 191; 624 NW2d 469 (2000).

## III. ANALYSIS

In their appeals, defendants make two arguments.[3]  First defendants argue that plaintiff failed to introduce evidence at the preliminary examination sufficient to support a finding that defendants maintained a dangerous animal under MCL 287.323.  Next, defendants argue that there was no evidence that they were aware that Roscoe was "a dangerous animal" as those terms are defined in MCL 287.321(a).

Defendants were charged under MCL 287.323(2), which provides as follows:

> If an animal that meets the definition of a dangerous animal in [MCL 287.321(a)] attacks a person and causes serious injury other than death, the owner of the animal is guilty of a felony, punishable by imprisonment for not more than 4 years, a fine of not less than $2,000.00, or community service work for not less than 500 hours, or any combination of these penalties.

In relevant part, MCL 287.321(a) defines "dangerous animal" as "a dog or other animal *that bites or attacks a person*, or a dog that bites or attacks and causes serious injury or death to another dog while the other dog is on the property or under the control of its owner."  (Emphasis added).

In *People v Janes*, 302 Mich App 34; 836 NW2d 883 (2013), Judge MJ KELLY wrote: "[T]he statute requires proof that the owner knew that his or her animal was a dangerous animal within the meaning of the dangerous animal statute before the incident at issue."  *Id*. at 38. Judge MJ KELLY went on to state: "[W]e find it unthinkable that the Legislature intended to subject law-abiding, well-intentioned citizens to a possible four-year prison term if, despite genuinely and reasonably believing their animal to be safe around other people and animals, the animal nevertheless harms someone."  *Id*. at 49.  Accordingly, "the Legislature's decision to limit an owner's liability to situations in which an animal 'that meets' the definition of a dangerous animal 'attacks' a person means that the prosecution must prove, in relevant part, that the animal has previously bitten or attacked a person."  *Janes*, 302 Mich App at 50.

---

[3] Conversely, plaintiff's central argument rests on its belief that the question of whether the dog was a "dangerous animal" under the statute was for the jury and not this Court to decide. However, this Court has made clear that "where the decision entails a question of statutory interpretation, i.e., whether the alleged conduct falls within the scope of a penal statute, the issue is a question of law . . . ."  See *Waltonen*, 272 Mich App at 683-684; quoting *Stone*, 463 Mich at 561; and *Hotrum*, 244 Mich App at 191.

Judge MJ KELLY articulated that, to sustain a conviction under MCL 287.323(2), the prosecution must prove the following elements:

(1) that [the defendant(s)] owned or harbored a dog or other animal, (2) that the dog or other animal met the definition of a dangerous animal provided under MCL 287.321(a) before and throughout the incident at issue, (3) that [the defendant(s)] knew that the dog or other animal met the definition of a dangerous animal within the meaning of MCL 287.321(a) before the incident at issue, and (4) that the animal attacked a person and caused serious injury other than death. [*Janes*, 302 Mich App at 54.]

As agreed by the parties, the central issue in this case is whether plaintiff introduced evidence to support elements (2) and (3). To resolve that issue, we must determine whether there was evidence that, prior to the attack on Flietstra, defendants' dog Roscoe met the statutory definition of "dangerous animal," as defined in MCL 287.321(a). *Janes*, 302 Mich App at 50. As noted above, MCL 287.321(a) defines "dangerous animal" to mean:

a dog or other animal *that bites or attacks a person*, or a dog that bites or attacks and causes serious injury or death to another dog while the other dog is on the property or under the control of its owner. However, a dangerous animal does not include any of the following:

(*i*) An animal that bites or attacks a person who is knowingly trespassing on the property of the animal's owner.

(*ii*) An animal that bites or attacks a person who provokes or torments the animal.

(*iii*) An animal that is responding in a manner that an ordinary and reasonable person would conclude was designed to protect a person if that person is engaged in a lawful activity or is the subject of an assault.

(*iv*) Livestock. (Emphasis added).

"Our purpose when interpreting a statute is to determine and give effect to the Legislature's intent. If the plain and ordinary meaning of a statute's language is clear, we enforce it as written. This Court will not interpret statutes in a way that renders any part of the statute surplusage. *People v Armstrong*, 305 Mich App 230, 243; 851 NW2d 856 (2014). (Internal citations omitted). In interpreting and applying a statutory definition, our purpose is to "determine and give effect to the Legislature's intent." *Id.* "We begin by examining the plain language of the statute; where that language is unambiguous, we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written." *People v Barrera*, 278 Mich App 730, 736; 752 NW2d 485 (2008).

Review of the plain language of MCL 287.321(a) inexorably leads to the conclusion that an animal is a "dangerous animal" if it: (1) bites *or* attacks a person or (2) bites or attacks another dog while the other dog is on the property of or under the control of its owner and causes

serious injury or death to the other dog. The statute also provides that a dangerous animal "does not include" the following:

>    (*i*) An animal that bites or attacks a person who is knowingly trespassing on the property of the animal's owner.

>    (*ii*) An animal that bites or attacks a person who provokes or torments the animal.

>    (*iii*) An animal that is responding in a manner that an ordinary and reasonable person would conclude was designed to protect a person if that person is engaged in a lawful activity or is the subject of an assault.

>    (*iv*) Livestock.

In this case, it is undisputed that the victim was not a trespasser onto defendants' property, or that the victim provoked or tormented Roscoe. Similarly it is undisputed that Roscoe was not protecting another person and the case did not involve livestock. Also, there was no evidence that Roscoe previously bit or attacked another dog. Accordingly, the last remaining inquiry set forth in the statute is for the Court to determine whether there was evidence presented that, before the attack, Roscoe previously bit *or* attacked *a person*.

The Legislature's use of the coordinating conjunction "or" between the verbs "bites" and "attacks" indicates that an animal can be a dangerous animal under either alternative. See *Auto-Owners Ins Co v Stenberg Bros, Inc*, 227 Mich App 45, 50; 575 NW2d 79 (1997) (explaining that "[t]he word 'or' generally refers to a choice or alternative between two or more things."). The words "and" and "or" "are not interchangeable and their strict meaning should be followed when their accurate reading does not render the sense dubious and there is no clear legislative intent to have the words or clauses read in the conjunctive." *Id.* (quotation omitted). In this case, reading the term "or" does not render the statute dubious or ambiguous. Rather, in using the conjunction "or" the Legislature clearly indicated that an animal is considered dangerous where (1) the animal bit a person without any further aggressive behavior or (2) the animal attacked a person, which may not necessarily have included biting during the attack.

The prosecution does not dispute that no evidence exists that Roscoe previously bit a person; therefore, resolution of the case turns on whether there was evidence to show Roscoe previously attacked *a person* and that defendants knew of the attack.

The statutory scheme does not define the word "attack(s)." "Where, as here, the Legislature has not expressly defined terms used within a statute, we may turn to dictionary definitions to aid our goal of construing those terms in accordance with their ordinary and generally accepted meanings." *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999). *Merriam-Webster's Collegiate Dictionary* (11th ed) defines the verb "attack" to mean "to set upon or work against forcefully" and "to begin to affect or to act on injuriously." *The American Heritage Dictionary of the English Language* (1996) defines the verb to mean "[t]o set upon with violent force" and "[t]o begin to affect harmfully."

Applying this definition to the evidence in the record exposes an absence of proof from which a trier of fact could conclude that Roscoe previously attacked a person. There exists no evidence that Roscoe set upon or worked against a person with violent force, or that the dog began to affect or act upon a person injuriously or harmfully. While the prosecution argues that Roscoe "attacked" other persons when he attacked the fence and lawnmower tires, this evidence only demonstrated that Roscoe attacked other *objects*, not that he attacked other *people*. To be considered a dangerous animal, the statutory text requires a showing that the animal previously attacked a person, not that the animal threatened a person or attacked an object. Thus, Roscoe's actions against the fence and the lawnmower were not synonymous to an attack against a person sufficient to render him a "dangerous animal" for purposes of MCL 287.321(a). Therefore, the district court erred when it bound defendants over for trial. Similarly, the circuit court erred in affirming the district court when it held that there was evidence to support the bind over because defendants were aware that Roscoe "scared people and had an aggressive disposition."[4] Under MCL 287.321(a), an animal is not deemed to be a "dangerous animal" if it has previously frightened people or exhibited an "aggressive disposition." Rather, as discussed above, in this case the statute requires proof that the animal previously acted in a certain manner—i.e. that it bit or attacked a person.[5] MCL 287.321(a). To incorporate other forms of aggressive behavior into the statute would be to improperly expand the statute beyond the scope of its plain language. See *Bay Co Prosecutor v Nugent*, 276 Mich App 183, 189; 740 NW2d 678 (2007) (noting that "[w]e may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself" (quotation marks and citation omitted)).

In sum, because plaintiff did not introduce any evidence to prove that Roscoe was a "dangerous animal," as that term is defined under MCL 287.321(a), plaintiff failed to introduce sufficient evidence to support the second and third elements necessary for a showing of probable cause that defendants violated MCL 287.323(2)—i.e. that defendants owned a dangerous animal at the time of the attack in this case, and that defendants knew that the animal was dangerous within the meaning of MCL 287.321(a). *Janes*, 302 Mich App at 54. The district court therefore abused its discretion in binding defendants over for trial in that it erred as a matter of law in applying MCL 287.321(a). See *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014) (noting that a trial court abuses its discretion when it errs as a matter of law.)

---

[4] The circuit court correctly set forth the standard of review when acting as an appellate court but did not articulate the standard of review when considering a question of statutory interpretation. See, *Waltonen*, 272 Mich App at 683-684.

[5] We acknowledge, though not at issue in this case, that a dog may meet the statutory definition or a dangerous animal by other means specifically set forth in MCL 278.321(a).

Reversed and remanded for entry of an order quashing the bind-overs. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Kurtis T. Wilder
/s/ Brock A. Swartzle